UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

PIETER VAN DONGEN, Individually and on   :
Behalf of All Others Similarly Situated,

                                 Plaintiff,   :

      vs.   :

CNINSURE INC., YINAN HU, QIUPING   :
LAI and PENG GE,

                          Defendants.   :

——————————————————————— x

Civil Action No. 11-cv-7320

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by CNinsure Inc. ("CNinsure" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of the American depositary shares ("ADSs") of CNinsure between March 2, 2010 and September 14, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

5.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.    Plaintiff Pieter van Dongen, as set forth in the accompanying certification and incorporated by reference herein, purchased the ADSs of CNinsure during the Class Period and has been damaged thereby.

7.    Defendant CNinsure, together with its subsidiaries, provides insurance brokerage and agency services, and insurance claims adjusting services in the People's Republic of China.

8.    Defendant Yinan Hu ("Hu") is a co-founder of CNinsure and was, at all relevant times, Chairman and Chief Executive Officer of CNinsure.

9.    Defendant Qiuping Lai ("Lai") is a co-founder of CNinsure and was, at all relevant times, President and Executive Director of CNinsure.

10.    Defendant Peng Ge ("Ge") is, and was at all relevant times, Chief Financial Officer of CNinsure.

11.    Defendants Hu, Lai and Ge are referred to herein as the "Individual Defendants."

12.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of CNinsure, were privy to confidential and proprietary information concerning CNinsure, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning CNinsure, as discussed in detail below. Because of their positions with CNinsure, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants

knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

13.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of CNinsure's business.

14.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

15.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose ADSs were, and are, registered with the SEC pursuant to the Exchange Act, and were, and are, traded on The NASDAQ Stock Market ("NASDAQ") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to CNinsure's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of CNinsure ADSs would be based upon

truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

16. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of CNinsure ADSs by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding CNinsure's business, operations and management and the intrinsic value of CNinsure securities; (ii) enabled Defendants to raise capital through a secondary offering of CNinsure ADSs whereby the Company reaped approximately $109.6 million in net proceeds; and (iii) caused Plaintiff and members of the Class to purchase CNinsure ADSs at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

17. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the ADSs of CNinsure between March 2, 2010 and September 14, 2011, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

18. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CNinsure ADSs were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by CNinsure or its transfer agent and may be notified of the pendency of

- 4 -

this action by mail, using the form of notice similar to that customarily used in securities class actions.

19.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

20.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of CNinsure;

(c)     whether the price of CNinsure ADSs was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

22.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

23.     Defendant CNinsure describes itself as a "leading independent intermediary company operating in China. CNinsure's distribution network reaches many of China's most economically developed regions and affluent cities. The Company distributes a wide variety of property and casualty and life insurance products underwritten by domestic and foreign insurance companies operating in China, and provides insurance claims adjusting as well as other insurance-related services."

24.     The Class Period begins on March 2, 2010.  On that date, CNinsure issued a press release announcing its financial results for the fourth quarter and year end of 2009, the period ended December 31, 2009.  For the year, the Company reported total net revenues of RMB1,154.9 million (US$169.2 million), net income attributable to the Company's shareholders of RMB300.8 million (US$44.1 million), and basic and diluted net income per ADS of RMB6.594 (US$0.966) and RMB6.481 (US$0.950), respectively.  Defendant Hu, commenting on the results, stated, in pertinent part, as follows:

> We are pleased to report continuing solid performance and net revenues in the fourth quarter of 2009 exceeding our previous guidance. This demonstrates our ability to execute on our strategy and deliver consistent results.  We are also pleased to report the further refinement of our business mix, which resulted from increased efforts to develop our life distribution capability as well as the recent industry-wide life insurance product mix restructuring campaign strongly advocated by the China Insurance Regulatory Commission ("CIRC").
>
> Our leadership and values enabled us to further strengthen our partnership with insurers in 2009, making significant progress in achieving corporate-to-corporate arrangements not only within life insurance segments but also within the P&C insurance and claims adjusting segments, which translated into higher performance bonuses and strengthened margins as a whole.
>
> While continuing to deliver near-term profitability, we took multiple actions during 2009 to further improve our competitiveness to ensure sustainable growth in the long term. These initiatives include:

- 6 -

(i)      diversifying our product and service offerings by introducing more customized insurance policies;

(ii)      extending our service offerings to consumer finance brokerage through acquisition; and

(iii)      rolling out our new operating platform company-wide.

Looking ahead to 2010, we expect to deliver strong growth of over 30% in net income with improving gross margin, driven by a few strong initiatives in the pipeline. These include build-out of new distribution channels (e.g. tele-marketing, online sales, brokerage business channel and bancassurance), introduction of more customized products for exclusive sales, and launching of bundled-sales campaigns. In addition, we expect to implement a fee-based revenue model, which has been successfully used by several of our P&C insurance agencies in 2009, on a wider-scale among our affiliated subsidiaries. With these moves, we believe that CNinsure's competitiveness and its leading position will be further enhanced amid the steadily recovering economy and a well regulated insurance market.

With regard to the Company's outlook, the press release stated, in pertinent part, as follows:

Going forward, the Company will offer quarterly guidance for net income attributable to the Company's shareholders instead of total net revenues in view of the increased uncertainty in its revenues due to the adoption of the new fee-based revenue model by some of its subsidiaries.

CNinsure expects its net income attributable to the Company's shareholders to grow by approximately 30% for the first quarter 2010 compared to the corresponding period of 2009. This forecast reflects CNinsure's current and preliminary view, which is subject to change.

25.      On May 24, 2010, CNinsure issued a press release announcing its financial results for the first quarter of 2010, the period ended March 31, 2010. For the quarter, the Company reported total net revenues of RMB282.0 million (US$41.3 million), net income attributable to the Company's shareholders of RMB67.3 million (US$9.9 million), and basic and diluted net income per ADS of RMB1.476 (US$0.216) and RMB1.429 (US$0.209), respectively. Defendant Hu, commenting on the results, stated, in pertinent part, as follows:

During the first quarter, we continued to deliver strong financial performance with total net revenues up 30.6% and earnings up 47.9% which exceeded our previous guidance. The inspiring results get us off to a good start to achieve our full year targets. We are also glad that our strategy to develop life insurance business has

produced positive returns with 156.7% growth in the first quarter, continuing to outpace other business lines.

Looking ahead, we remain optimistic about our prospects. We expect the next three to five years to be the golden period for the development of China's insurance and financial services industries, in the wake of China's widening economic recovery, the rapid accumulation of personal wealth by Chinese people and the PRC government's stimulus incentives on domestic consumption. While continuing to solidify our leadership position in the professional insurance intermediary sector, we intend to explore new distribution channels and diversify our product and service offerings, so as to better capitalize on the opportunities presented by the growing demand from consumers for diversified financial services and products and to ensure the sustainable growth of our company in the long run.

With regard to the Company's outlook, the press release stated, in pertinent part, as follows:

CNinsure expects its net income attributable to the Company's shareholders to grow by approximately 35% for the second quarter 2010 compared to the corresponding period of 2009. This forecast reflects CNinsure's current and preliminary view, which is subject to change.

26.     On July 8, 2010, the Company issued a press release announcing that it priced its secondary public offering of 4.6 million ADSs at $25.00 per ADS (the "Secondary Offering"). In connection with the Secondary Offering, CNinsure filed and disseminated a registration statement (the "Registration Statement"). The Registration Statement failed to disclose the material adverse facts detailed herein.

27.     On July 15, 2010, the Company issued a press release announcing the closing of its Secondary Offering of 4.6 million shares of its ADSs, whereby the Company received net proceeds of approximately $109.6 million.

28.     On August 23, 2010, CNinsure issued a press release announcing its financial results for the second quarter of 2010, the period ended June 30, 2010. For the quarter, the Company reported total net revenues of RMB365.8 million (US$53.9 million), net income attributable to the Company's shareholders of RMB118.6 million (US$17.5 million), and basic and diluted net income

- 8 -

per ADS of RMB2.600 (US$0.383) and RMB2.494 (US$0.368), respectively.  Defendant Hu, commenting on the results, stated, in pertinent part, as follows:

> CNinsure reported another solid quarter and once again beat our previous guidance, with total net revenues and net income attributable to CNinsure's shareholders growing 28.1% and 40.2% year-over-year, respectively.  We are thrilled to see that the strong growth momentum in our life insurance business continued into the second quarter, with life insurance growing over 138% year-over-year and accounting for 36.1% of our total net revenues, driven by the increases in first year commission rate, accumulation of renewal commissions and performance bonus.  Meanwhile, the profitability and bargaining power of our P&C business was greatly enhanced by our initiatives to promote bundled sales, establish strategic partnership and co-develop customized products with more insurers and strengthen our insurance brokerage business to refine the mix of our P&C business which we believe will help improve our earnings stability in the long run.
>
> While continuing to grow our existing three businesses, we are gearing up to build groundwork for long-term growth by adding new profit centers. As of date, we have extended our service offerings to consumer credit brokerage business, established an insurance brokerage business unit to facilitate our expansion from retail to corporate insurance brokerage business, and recently acquired an e-commerce insurance service company in an effort to build a tri-dimensional distribution channel by combining the e-commerce platform with our existing nationwide distribution and service network. To fund the establishment of the new profit centers, CNinsure completed a follow-on public offering in July. Although the offering may lead to a dilution to our EPS in the short term, the management expects the Company will still be able to achieve the target of over 30% EPS growth for 2010.
>
> In the past decade, CNinsure has kept a successful track record of expanding into new areas and diversifying product offerings to fuel the Company's growth. We believe that the vision and strong execution of the management will make our aforementioned new initiatives another success. CNinsure, with its early-mover advantage, will continue to lead the insurance intermediary market in the years to come.

With regard to the Company's outlook, the press release stated, in pertinent part, as follows:

> CNinsure expects its net income attributable to the Company's shareholders to grow by approximately 38% for the third quarter 2010 compared to the corresponding period of 2009. This forecast reflects CNinsure's current and preliminary view, which is subject to change.

29.     The statements referenced above in ¶¶24, 25, 26 and 28 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     that the Company was materially overstating its net income by understating the costs associated with the Company's scorecard system;

(b)     that the Company failed to account for incentives provided to the Company's agents as costs since those incentives were reasonably likely to be tendered at a future date; and

(c)     as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its prospects.

30.     On November 22, 2010, CNinsure issued a press release announcing its financial results for the third quarter of 2010, the period ended September 30, 2010.  For the quarter, the Company reported total net revenues of RMB388.2 million (US$58.0 million), net income attributable to the Company's shareholders of RMB109.8 million (US$16.4 million), and basic and diluted net income per ADS of RMB2.198 (US$0.329) and RMB2.128 (US$0.318), respectively. Moreover, the Company reported an increase of 285.5% in share-based compensation expenses. Defendant Hu, commenting on the results, stated, in pertinent part, as follows:

> The Company maintained strong growth momentum in the third quarter with total net revenues and net income attributable to CNinsure's shareholders growing 30.4% and 42.7% year-over-year, respectively, exceeding our previous guidance. Although the follow-on public offering in July led to a dilution in our EPS, we still recorded a 29.7% year-over-year diluted EPS growth in the third quarter, demonstrating the strong execution capability of the management. Robust growth of our three existing business lines continued into the third quarter with the life insurance business and claims adjusting business growing 109.1% and 34.3% year-over-year, respectively. The overall commission rate from the property and casualty insurance business increased over the previous quarter, which led to a year-over-year growth of 6.7% in our property and casualty insurance business in the third quarter as compared to year-over-year decline of that in the second quarter. We believe there is still room for further improvement in our property and casualty insurance commission rate. During the past decade, CNinsure has built a nation-wide sales and service network in 23

provinces, enabling the Company to change its role from an insurance product retailer with no bargaining power to a general agency with more influence in its cooperation with upstream product suppliers. To better meet customers' needs, we have placed more focus on customized products instead of merely distributing general products already prevalent in the market. Furthermore, we have been building new profits centers to sell multiple products to each of our customers in an effort to strengthen our profitability. We believe the ongoing insurance marketing system reform, coupled with the increasing demand for asset preservation and appreciation and financing service as a result of the growth in people's disposable income will provide CNinsure with greater opportunities for future development.

Since our initial public offering in 2007, organic growth and growth through acquisitions have become the dual engines for our business development and we have maintained positive balance between the two strategies. Of the 30.4% year-over-year growth in terms of total net revenues in the third quarter, organic growth accounted for approximately 72% while growth through acquisitions accounted for approximately 28%. Due to the immature and fragmented nature of China's insurance intermediary industry, we have adopted a unique acquisition model to identify suitable acquisition targets while reducing risks, which has proved to be viable. Looking ahead, acquisition will continue to be one of our most important growth strategies. We will constantly review and refine our acquisition model to make it more simplified and straightforward, in terms of valuation matrix, payment method, and earn-out provisions. For the future potential acquisitions, we will, as always, place strong emphasis on restricting risk, enhancing cash flow and insisting on high growth and high return.

We are now building the groundwork for our e-commerce insurance, insurance brokerage, consumer finance and wealth management businesses in an effort to turn our blueprint for the next five years into reality. Examining all the opportunities and challenges, we firmly believe that the Company will be able to continue its strong growth momentum for the next few years. We are confident in the growth prospects of the Company and China's financial services industry and committed to maximizing shareholder value by pursuing the long-term sustainable growth of the Company.

With regard to the Company's outlook, the press release stated, in pertinent part, as follows:

CNinsure expects its net income attributable to the Company's shareholders excluding non-recurring investment income incurred by business combination achieved in stages to grow by approximately 32% for the fourth quarter 2010 compared to the corresponding period of 2009. This forecast reflects CNinsure's current and preliminary view, which is subject to change.

31.    In reaction to the Company's third quarter operating results and the large increase in

share-based compensation expenses, the price of the Company's ADSs fell $2.91 per ADS, or 13%,

to close at $19.00 per ADS, on November 23, 2010.

32.    On December 2, 2010, OLP Global LLC ("OLP Global") issued an analyst report

entitled "CNinsure (CISG) -- Equity Incentives Likely Unaccounted For, Overstating Profits." The

OLP Global analyst report claimed that the Company may have understated commission expenses

and overstated net income as a result of the way the Company incentivizes its agents, which the OLP

Global report said is "no different from an equity-based compensation plan." In that regard, the OLP

Global report stated, in pertinent part, as follows:

> During 3Q10 earnings call, CISG management denied that the program implemented to incentivize sales agents is an equity incentive plan. Instead, CISG called it a "scorecard" system, indicating that CIRC's recent enforcement initiative on equity incentives should have no restrictions on CISG. As we uncover more facts about CISG's so-called "scorecard", we are convinced that it is no different from an equity-based compensation plan. The awarded equity incentive shares [] are part of agents' total compensation and can be converted into cash (RMB 5 per share at any time) or equity. We also believe the commission paid in the form of equity incentive shares has not been reflected in CISG's financial statements. This leads us to believe that CISG may have understated commission expenses and overstated net income by a meaningful amount. Our findings further revealed that CISG's agents may be holding shares in an entity that does not legally exist. Should any disruption occur among CISG's network of agents, CISG's daily operations and growth prospects will likely suffer.
>
> •      **Equity incentive shares awarded to agents are part of agents' total compensation**. In December 2007, CISG announced that the company would start to implement an equity incentive plan [] among its insurance agents. Under this plan, eligible agents would receive compensation in 1) standard cash commission; and 2) equity incentive shares[].  We believe the equity incentive plan has been the key driver behind the fast growth in the number of sales agents in CISG's network.
>
> •      **However, the commission expense associated with equity incentive shares has not been reflected in CISG's financial statements**. In our view, agents' compensation, whether in the form of cash commission or equity incentive shares, should be reflected to match the recorded revenue. CISG's historical share-based compensation has been minimal, and no other line items have included the associated costs of equity incentive shares. We believe CISG may have understated commission expenses and overstated net income by a meaningful amount. Based on our

estimates, the accumulative cost associated with equity incentive shares is likely in the range of US$46 - US$61 million.

- **CISG's agents appear to be holding shares in an entity that does not legally exist.** According to CISG's presentation to promote equity incentives in CISG-hosted information sessions, Finestart Holdings Limited[], (CNinsure Employee Share Ownership Limited Co.) is a Hong Kong registered entity to hold equity shares. However, we are unable to verify the registration either in Hong Kong or in mainland China, leading us to believe that Finestart does not legally exist. We believe Finestart is a hoax that CISG management uses to withhold indefinitely part of its agents' compensation, allowing CISG to record less cash compensation and still incentivize agents to work harder and longer for CISG. We believe CISG's operating risks will likely increase and growth will likely be impacted, should any disruption occur among CISG's network of agents.

- **CISG's 2007 disclosure on the level of bonus commission refutes management's explanation on gross margin.** In our November 8 report, we questioned why CISG's reported profit margins at the corporate level have been significantly better than those of its local agencies. Management explained that CISG was able to earn meaningful bonus commission, which accounted for ~50% of total commissions due to CISG's sales volume and service quality. In CISG's 2007 IPO prospectus, the company disclosed that the bonus portion was merely 1.1% of total commissions in 2006 and none in 2005. We believe it is highly unlikely that bonus commission suddenly rose to 50% of total commissions. CISG no longer has similar disclosure in subsequent filings. This further convinces us that CISG's gross margin of 50% is likely overstated.

33.     In reaction to the OLP Global report, the price of the Company's ADSs fell $5.36 per ADS over the next two trading days, or 24%, to close at $16.79 per ADS, on December 3, 2010.

34.     Following the issuance of the OLP Global report, Defendants held a conference call with analysts and investors and attempted to refute the OLP Global report by stating that the incentives CNinsure gives to its agents "should not be recognized as costs" according to the Company's accounting principles.  The Company presents its consolidated financial statements in accordance with U.S. Generally Accepted Accounting Principles ("GAAP").  However, according to U.S. GAAP, these incentives should be recorded as costs since those incentives (similar to credit card points or airplane miles) were reasonably likely to be tendered at a future date.

- 13 -

35.     In response to the OLP Global report, Defendant Hu stated, in pertinent part, as follows:

> First of all, the management has explained explicitly in the Q3 conference call that *the so-called incentive shares in CNinsure was nothing but a scorecard for points when accumulated to certain amounts, exchanged for certain training or other activities provided by the Company.*
>
> *Those activities according to the accounting principles should not be recognized as costs.* Adele's claim that CNinsure's scorecard system is no different from an equity-based incentive plan was absolutely misleading.
>
> Secondly, Fine Star Holdings Ltd. which was regarded not, I quote, not legally (inaudible) in Adele Mao's report was actually registered in British Virgin Island, BVI. Although it is providing services to the employees and sales agent of CNinsure who wanted to purchase US stocks.
>
> It is actually an independent company which has not -- no interest of any kind with CNinsure. Adele Mao without making any prior survey and investigation regarded Fine Star as a hoax and does not legally exist and accuses the management of cheating sales agents which is extremely reckless and irresponsible.
>
> Thirdly, concerning CISG's growing gross margin, as CNinsure accumulates bigger and bigger business scale and delivers better [call city] policies, our gross margin has witnessed steady improvement during the past five years. The fact that our current business scale has grown ten times bigger than that in 2005 and has resulted in large gaps between CSIG and our competitors.
>
> As our current business scale is at least five times bigger than our competitors, a comparison of CISG seat to the competitors who are much smaller is as ridiculous as the comparison of the current CISG to what it was five years ago.  In order to address the misunderstanding and the concerns of our investors, we would like to make the following clarifications on Adele Mao's defame on the Company.
>
> For one, the scorecard program implemented among the sales agent is a certificate of points accumulated by the sales agents and is an effective incentive for CISG to retain its talents and improve the quality of its business. Sales agents accumulate points from every dollar of [center] premium they deliver and the points serves several purposes.
>
> *With the accumulated points, sales agents are eligible to participate in the reward programs provided by our insurer partners and also exchange for gifts, travel programs or training sessions. These points could also be swapped for conferences similar like MDRT or training sessions or travel organized by CISG and its subsidiaries.*

*Number three, with these points, sales agents may be qualified to apply for stock options of CISG. I would like to emphasize here they are using their points accumulated to swap for a qualification first.*

*Number four, sales agents using the points accumulated might be qualified to buy warrants which may be – which may ground them the right to buy shares of CISG's affiliated subsidiaries if available [as a fair time].* Once again, here I emphasize they will be using the points to exchange for the qualification to have the warrants to buy all their shares.

Number five, sales agents are eligible with few amount of points to become full-time employees of CNinsure. And number six, sales agents once again are eligible to enjoy better business processing and services with accumulated points.

*So, if the program is sponsored by the insurer, our partner insurers, no costs or expenses would occur in CISG even if sales agents swap their points for various kinds of rewards.* [If the program were] provided by CISG or its subsidiaries operating in China, we surely have recognized the cost for incentive compensation in each reported period.

In addition to what I just stated, let me make one further remark here. It is becoming a normal practice that normally every six months, CISG will be holding various kinds of campaigns or points swap meetings together with our partner insurers.

During all these sessions, agents will be using the points accumulated to swap different type of reward activities. And then once again, when those activities sponsored by insurers, the cost of all this are not recorded in CISG for the financial statement, while the activities sponsored by CISG and its subsidiaries themselves, the costs were surely recorded in a corresponding period of time.

And also, typically, once a year, CISG will be holding an MDRT type of activity for its top sales professionals and this MDRT type conference is usually followed by an overseas trip for its top sales agents. Both the MDRT conference as well as the overseas trip are paid by CISG and the costs are recorded in the financial statement.

Number four, if these scorecard holders which to choose to subscribe for newly issued original shares of our affiliated subsidiaries, the cost will be recorded at that time when this occurred. If that happens, the subscription price will be paid by sales agents with all these points. Therefore, no costs will be recorded in the financial statement of CISG.

Based on what I have just explained to the very nature of our scorecard program as well as according to the accounting principles, we don't think that CISG has understated its incentive-related compensation costs or expenses, neither we believe that the Company is overstating its net profit. Having said all this, the management of CISG has noted [CRRC's] latest administrative order or the regulation of the incentive plan adopted by insurance intermediaries which was published on November 15.

- 15 -

Actually, before the promulgation of this circulation, [CRRC] has made extensive research on the incentive plan adopted by various insurance intermediaries. After its survey to CNinsure, CRRC gave consent to our incentive plan as a certificate of point accumulation to swap for training, traveling or other gifts.

We were also delighted to see that the formation of this very circulation has given consideration to some of our reasonable suggestions and advices. We believe that this circulation will effectively prevent risks aroused by adoption of the equity-based incentive plan of the small to medium-sized insurance intermediaries. CNinsure as a highly regulated company, we're actually a beneficiary in a more orderly market environment.

Next, in relation to employee equity holding company or Fine Star Holdings Ltd., to our knowledge, it is an independent operating company and serves as a bridge connecting the Company to US stock trading and providing our employees and sales agents with US and CISG stock trading services. After all, a well-facilitated channel for American stock trading is difficult to find in China, in mainland China. We believe this is an effective way to help our employees and sales agents to share a slice of cake while the Company is growing well.

In fact, Fine Star Holdings Ltd. will collect the full amount of the investment funds from each participant before it makes all the collected money into the American stock market. As far as we know, we've seen the portfolio of Fine Star Holdings Ltd. There's not only CISG stock, but also other stocks including Citibank's etc.

Fine Star Holdings Ltd. does legally exist and is actually an asset management company with good operating track record instead of, and I quote, "a hoax that does not legally exist" as stated in Adele Mao's report.  Thirdly, let me talk about CNinsure's gross margin.

I believe we have to look at this using an operating background of nearly 12 years. We have gone through the period when we were lack of sales volume.

CNinsure of course had no bargaining power in negotiating with the insurance companies for sales volume and quality-based bonus. We did not make any profit until 2004.

Starting from 2005, with the growth of CNinsure's sales volume and the improvement in sales quality, our volume and quality-based performance bonus has also been on the rise. CNinsure recorded strong growth since 2005 with net revenues increasing from CNY142 million in 2005 to CNY245.6 million in 2006.

And in 2007, our revenue was CNY446.9 million and again in 2008, that revenue increased to CNY843 million. And then the year 2009 witnessed our revenue becoming CNY1.154 billion. And our topline will be expected around CNY1.5 billion in total this year.

Based on the numbers I've cited, it is easy to come to the conclusion that the topline of CNinsure in 2010 compared to that of 2005 was 10.6 times bigger and our collaboration with various insurers were expended from very lower level or at subsidiary level gradually to provincial branch level and eventually to headquarter level.

We're always emphasizing the importance of signing this so-called corporate to corporate agreement. Because this not only shows that CNinsure has at present the right sales volume as well as the right sales quality which are enabling insurance companies to take us seriously, but also enabling CNinsure to have a much better bargaining power to get both the higher commission rate as well as more sales bonus based on volume and quality.

Therefore it is not fair for the report to benchmark CNinsure's commission level against those of two peers of CNinsure which were much smaller in size than CNinsure. As far as we know, one of them or one of the competitors mentioned in the report by Adele Mao is primarily focused on life insurance distribution. As of the end of the second quarter of 2010, its total net revenue is less than half of CNinsure's life insurance revenues and less than 20% of CNinsure's total net revenue.

The other one mentioned also in the Adele Mao's report on the other hand is primarily focused on P&C insurance distribution. Its total revenue is less than 1/20 of CNinsure's total PNC revenues and less than 1/30 of CNinsure's total net revenues. Their size are not comparable with CNinsure and it is somewhat ridiculous to think that CNinsure should get the same level of commission with them.

Fourthly, CNinsure is scheduled as we pronounced already to host an analyst and investors open day on December 10, 2010 in [Chengdu Sichuan] province. We sincerely welcome you to join us on the event.

We are open to answer any further questions from analysts and investors face to face. We will also implement a series of measures to address various questions raised about the Company including providing updates about the Company's corporate strategy, releasing a refined acquisition model, and sharing with you our plan to improve disclosure going forward and explaining our employee incentive program etc., etc.

And finally, the management would like to have [to] commit that we will not sell [a] single share[] over the next 180 days.  [Emphasis added.]

36.     On March 1, 2011, CNinsure issued a press release announcing its financial results for the fourth quarter and year end of 2010, the period ended December 31, 2010.  For the quarter, the Company reported total net revenues of RMB449.0 million (US$68.0 million), net income attributable to the Company's shareholders of RMB126.5 million (US$19.2 million) and basic and

diluted net income per ADS of RMB2.514 (US$0.381) and RMB2.447 (US$0.371), respectively.

Moreover, the Company reported an increase in total operating costs and expenses of 29.0% and an

increase in share-based compensation expenses of 298.9% for the same quarter in 2009.  Defendant

Hu, commenting on the results, stated, in pertinent part, as follows:

> I am pleased to report that CNinsure continued to deliver solid financial results in 2010 with total net revenues and net income attributable to the Company's shareholders growing 28.6% and 40.4%, respectively, and fully diluted EPS growing 31.6% to RMB 8.529, which exceeded the management target.
>
> During 2010, we continued our efforts to enhance our long-term competitiveness by further penetrating into the property and casualty ("P&C") and life insurance markets, and launching initiatives to explore the insurance brokerage, e-commerce insurance, wealth management and consumer credit brokerage businesses. Going forward, the life insurance business, which has become a key growth driver for CNinsure benefiting from the strong market demand and growth potential, will remain a strategic focus for the Company. In the meantime, with telemarketing and online sales rapidly gaining popularity as a distribution channel for commodity type P&C insurance products, e-commerce insurance business will become a new strategic focus for us in the next few years. As such, we expect to make significant investment in IT infrastructure, call center and advertisement to develop our e-commerce insurance platform which we believe will enable us to directly reach a broader customer base.
>
> CNinsure received several awards in 2010, including the Insurance Intermediary of the Year for 2010 and a 2010 Financial Innovation Award. We are honored that after ten years' of development, CNinsure has won the support and recognition of the regulatory body and its insurance partners, which has motivated us to strengthen our commitment in the insurance intermediary market. The management will reward their loyalty and support by presenting them a better and stronger CNinsure.

With regard to the Company's outlook, the press release stated, in pertinent part, as follows:

> CNinsure expects its net income attributable to the Company's shareholders, excluding non-recurring investment income incurred by business combination achieved in stages and the estimated strategic spending on e-commerce insurance, to grow by approximately 20~23% for the first quarter 2011 compared to the corresponding period of 2010. This forecast reflects CNinsure's current and preliminary view, which is subject to change.

37.     In reaction to the increases in total operating costs and expenses and share-based compensation expenses, the price of CNinsure ADSs fell $1.96 per ADS, or 11%, to close at $15.92 per ADS, on March 2, 2011.

38.     On May 16, 2011, the Company issued a press release announcing that it received a preliminary non-binding proposal letter from a company controlled by Defendant Hu and entities affiliated with him to acquire all of the outstanding ordinary shares of the Company for $19.00 per ADS. In response to this announcement, the price of CNinsure ADSs rose $4.16 per ADS, or 32%, to close at $17.32 per ADS. However, the temporary inflation in the price of the Company's ADSs would be short-lived as the market soon realized that the going private transaction was not likely to happen.

39.     On August 29, 2011, CNinsure issued a press release announcing its financial results for the second quarter of 2011, the period ended June 30, 2011. For the quarter, the Company reported total net revenues of RMB400.7 million (US$62.0 million) and basic net income per ADS of RMB2.001 (US$0.310). With regard to the Company's outlook, Defendants stated, in pertinent part, as follows:

> Going forward, the Company will offer quarterly guidance for total net revenues instead of net income attributable to the Company's shareholders in view of the increased uncertainty in its net income due to inflationary concerns, strategic spending on e-commerce insurance business and professional fees related to the non-binding going-private proposal that the Board received on May 14, 2011.
>
> CNinsure expects its total net revenues from continuing operations to grow by approximately 22% for the third quarter of 2011 compared to the corresponding period of 2010. This forecast reflects CNinsure's current and preliminary view, which is subject to change.

40.     Then, on September 15, 2011, the Company issued a press release announcing that the Special Committee of its Board of Directors received a notice from Defendant Hu and companies

- 19 -

affiliated with him that "they have unanimously determined to withdraw the non-binding going private proposal dated May 14, 2011."

41.     In reaction the announcement of the withdrawal of the going private proposal, the price of CNinsure ADSs fell $1.64 per ADS, or 15%, to close at $9.03 per ADS.  The price of the Company's ADSs continued to fall during the next two trading days as the market continued to digest the Company's announcement, closing at $7.31 per ADS on September 19, 2011.

42.     The market for CNinsure ADSs was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, CNinsure ADSs traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired CNinsure ADSs relying upon the integrity of the market price of CNinsure ADSs and market information relating to CNinsure, and have been damaged thereby.

43.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of CNinsure ADSs, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

44.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about CNinsure's business, prospects and operations.  These material misstatements and

omissions had the cause and effect of creating in the market an unrealistically positive assessment of CNinsure and its business, prospects and operations, thus causing the Company's ADSs to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's ADSs at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

45.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding CNinsure, their control over, and/or receipt and/or modification of CNinsure's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning CNinsure, participated in the fraudulent scheme alleged herein.

46.     Defendants were further motivated to engage in this course of conduct in order to enable Defendants to raise capital through a secondary offering of CNinsure ADSs whereby the Company reaped approximately $109.6 million in net proceeds.

### Loss Causation/Economic Loss

47.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of CNinsure ADSs and operated as a fraud or deceit on Class Period purchasers of CNinsure ADSs by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and

- 21 -

fraudulent conduct were disclosed and became apparent to the market, the price of CNinsure ADSs fell precipitously as the prior artificial inflation came out. As a result of their purchases of CNinsure ADSs during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

48.     By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of CNinsure's business and prospects. Defendants' false and misleading statements had the intended effect and caused CNinsure ADSs to trade at artificially inflated levels throughout the Class Period, reaching as high as $28.49 per ADS on April 15, 2010.

49.     As a direct result of the disclosures on November 22, 2010, December 2, 2010, March 2, 2011 and September 15, 2011, the price of CNinsure ADSs fell precipitously, falling from their Class Period high of $28.49 per ADS to $9.03 per ADS, a decline of approximately 68%. These drops removed the inflation from the price of CNinsure ADSs, causing real economic loss to investors who had purchased CNinsure ADSs during the Class Period.

50.     The 68% decline from the Company's Class Period high was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price decline in CNinsure ADSs negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of CNinsure ADSs and the subsequent significant decline in the value of CNinsure ADSs when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

51.     At all relevant times, the market for CNinsure ADSs was an efficient market for the

following reasons, among others:

(a)     CNinsure ADSs met the requirements for listing, and were listed and actively

traded on the NASDAQ, a highly efficient and automated market;

(b)     as a regulated issuer, CNinsure filed periodic public reports with the SEC and

the NASDAQ;

(c)     CNinsure regularly communicated with public investors via established

market communication mechanisms, including regular disseminations of press releases on the

national circuits of major newswire services and other wide-ranging public disclosures, such as

communications with the financial press and other similar reporting services; and

(d)     CNinsure was followed by several securities analysts employed by major

brokerage firms who wrote reports which were distributed to the sales force and certain customers of

their respective brokerage firms.  Each of these reports was publicly available and entered the public

marketplace.

52.     As a result of the foregoing, the market for CNinsure ADSs promptly digested current

information regarding CNinsure from all publicly available sources and reflected such information in

the prices of the stock.  Under these circumstances, all purchasers of CNinsure ADSs during the

Class Period suffered similar injury through their purchase of CNinsure ADSs at artificially inflated

prices and a presumption of reliance applies.

**No Safe Harbor**

53.     The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of CNinsure who knew that those statements were false when made.

**COUNT I**

**Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

54.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

56.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADSs during the Class Period.

57.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CNinsure ADSs.  Plaintiff and the Class would not have purchased CNinsure ADSs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

58.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of CNinsure ADSs during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

59.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60.     The Individual Defendants acted as controlling persons of CNinsure within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of CNinsure, and their ownership of CNinsure stock, the Individual Defendants had the power and authority to cause CNinsure to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members

against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: October 17, 2011                    ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                           SAMUEL H. RUDMAN
                                           MARIO ALBA, JR.


                                           _____
                                           SAMUEL H. RUDMAN

                                           58 South Service Road, Suite 200
                                           Melville, NY 11747
                                           Telephone: 631/367-7100
                                           631/367-1173 (fax)

                                           HOLZER HOLZER & FISTEL LLC
                                           MICHAEL I. FISTEL, JR.
                                           MARSHALL DEES
                                           200 Ashford Center North, Suite 300
                                           Atlanta, GA 30338
                                           Telephone: 770/392-0090
                                           770/392-0029 (fax)

                                           DYER & BERENS LLP
                                           JEFFREY A. BERENS
                                           303 East 17th Avenue, Suite 300
                                           Denver, Colorado 80203
                                           Telephone: 303/861-1764
                                           303/395-0393 (fax)

                                           Attorneys for Plaintiff

- 26 -

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

1.      The undersigned has reviewed the complaint and approves its filing.

2.      The undersigned did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this lawsuit.

3.      The undersigned is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      The undersigned's purchases and sales of CNinsure Inc. (NASDAQ: CISG) common stock during the class period are as follows:

| Transaction Date | # of Shares | Buy or Sell | Price/Share |
|---|---|---|---|
| April 23, 2010 | 500 | Buy | $26.70 |

5.      During the three years prior to the date of this certificate, the undersigned has sought to serve or served as a representative party for a class in the following actions under the federal securities laws (if any):

6.      The undersigned will not accept any payment for serving as a representative party on behalf of the class beyond the undersigned's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on: _oktober 5_ , 2011.

Pieter van Dongen