ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/24/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
PIETER VAN DONGEN, Individually  :
And on Behalf of All Others       :
Similarly Situated,               :       11 Civ. 7320 (VM)
                                  :
                                  :       **DECISION AND ORDER**
              Plaintiff,          :
                                  :
      - against -                 :
                                  :
CNINSURE INC., et al.,            :
                                  :
              Defendants.         :
------------------------------------X

**VICTOR MARRERO, United States District Judge.**

Lead Plaintiffs Jeff Schram and Linda Schram ("Lead Plaintiffs"), individually and on behalf of all others similarly situated, filed an amended class action complaint (the "Amended Complaint") against defendants CNinsure Inc. ("CNinsure"), Yinan Hu ("Hu"), Qiuping Lai ("Lai"), and Peng Ge ("Ge," and collectively, "Defendants"), asserting two counts: (1) violation of Securities Exchange Act § 10(b) ("Section 10(b)") as well as Securities and Exchange Commission ("SEC") Rule 10b-5 ("Rule 10b-5") promulgated thereunder, and (2) violation of Securities Exchange Act § 20(a) ("Section 20(a)"). (See Dkt. No. 12.) CNinsure subsequently moved to dismiss the Amended Complaint (see Dkt. No. 13), and the parties completed

-1-

briefing on the motion (see Dkt. Nos. 14, 17 & 19).[1]  For reasons stated below, CNinsure's motion to dismiss is DENIED.

## I. BACKGROUND[2]

Plaintiff Pieter Van Dongen, individually and on behalf of all others similarly situated, initially filed this action on October 17, 2011.  (See Dkt. No. 1.)  The Court subsequently granted the motion of Jeff and Linda Schram for appointment as lead plaintiffs, and for the approval of the law firm of Robbins Gellar Rudman & Dowd LLP as lead counsel, (see Dkt. No. 10), and the Amended Complaint followed on August 1, 2012 (see Dkt. No. 12).

---

[1]  Lead Plaintiffs have failed to serve any of the individual defendants in this matter.  As such, the parties' briefing and the Court's analysis will focus entirely on the Section 10(b) claim.  The Court lacks jurisdiction over the only parties named in the Section 20(a) claim, and that claim is summarily dismissed.  See Barnett v. City of Yonkers, 829 F. Supp. 594, 602-03 (S.D.N.Y. 1990) (dismissing claims against certain party because "[a]bsent proper service, this Court is without jurisdiction over an additional party"); see also Apple v. Jewish Hosp. & Medical Ctr., 829 F.2d 326, 332 (2d Cir. 1987) ("Original service of process is, of course, a sine qua non requirement for a court to acquire jurisdiction over an additional party.").

[2]  Except where otherwise noted explicitly, the factual summary below is derived from the Amended Complaint (Dkt. No. 12), and the documents cited or relied upon for the facts pled therein, which the Court accepts as true for the purposes of ruling on a motion to dismiss.  See Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 180 (2d Cir. 2008) (citing GICC Capital Corp. v. Technology Fin. Grp., Inc., 67 F.3d 463, 465 (2d Cir. 1995)).  A court may take into account any written instrument attached to the complaint, as well as statements and documents "incorporated in [the complaint] by reference" without converting a motion to dismiss into one for summary judgment.  Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).  Except where specifically quoted, no further citation to the Amended Complaint will be made.

-2-

Lead Plaintiffs represent a class of purchasers of American Depositary Shares ("ADSs") of CNinsure issued between March 2, 2010 and November 21, 2011 (the "Class Period"). CNinsure's ADSs trade on the NASDAQ Global Select Market. CNinsure is a Cayman Islands corporation headquartered and operating in the People's Republic of China. CNinsure is an insurance intermediary. It distributes insurance products underwritten by others through its network of sales agents. CNinsure does not assume underwriting risk; it generates revenues by receiving commissions from insurance companies. All three individuals named as defendants served as executives of CNinsure during the Class Period: Hu served as Chief Executive Officer and Chairman of the Board of Directors, Lai served as President and Executive Director, and Ge served as Chief Financial Officer.

Briefly stated, Lead Plaintiffs allege that Defendants defrauded purchasers of CNinsure ADSs by disseminating misstatements and/or omitting material facts regarding the compensation of CNinsure's sales agents. As a result, class members purchased the ADSs at artificially inflated prices, and Defendants were able to raise capital in a

secondary offering in July 2010 resulting in roughly $109.6 million in net proceeds.

A. INITIAL MISSTATEMENTS AND THE OPENING OF THE CLASS PERIOD

Lead Plaintiffs assert that the Class Period begins on March 2, 2010 with the issuance of CNinsure's press release announcing its financial results for the fourth quarter and full year ending December 31, 2009 (the "March 2, 2010 Press Release"). CNinsure reported an increase in net revenues, and primarily attributed this success to enhanced sales and marketing efforts, including a 33.9% year-over-year increase in the number of sales agents. Lead Plaintiffs allege that this statement identifying enhanced sales and marketing as the driver for increased revenues was materially false and misleading because: (1) Defendants failed to disclose that CNinsure was promoting equity incentive compensation to its sales agents; (2) this equity incentive compensation plan was the driver of CNinsure's increased revenues and sales force; (3) the plan also allowed CNinsure to withhold a portion of its sales agents' compensation, meaning that CNinsure recorded lower commission and fee expenses; (4) Defendants' positive statements about CNinsure and its future prospects had no reasonable basis and thus misled investors; and (5)

-4-

Defendants were knowing or reckless in misleading investors about the compensation plan.

Lead Plaintiffs allege that Defendants' misstatements and/or omissions regarding the equity incentive compensation plan continued with CNinsure's filing of its annual report with the SEC on May 7, 2010 (the "May 7, 2010 Annual Report").   The report, signed by defendant Hu, stated in relevant part that sales agents were compensated only by commissions, and further detailed how the commissions were calculated (e.g., based on a percentage of the sale and fees generated by the sale), depending on the type of insurance policy at issue.   Roughly two months later, on July 9, 2010, CNinsure announced that it priced a secondary offering, which closed on July 15, 2010 and resulted in $109.6 million in net proceeds for the company. The registration statement filed with the SEC in connection with the secondary offering likewise did not mention the equity incentive compensation plan that forms the basis of Lead Plaintiffs' claims (the "July 15, 2010 Registration Statement").

B. OLP REPORTS AND CNINSURE'S RESPONSE

On November 22, 2010, OLP Global LLP ("OLP"), a self-described alternative research and consulting firm focused

-5-

on publicly listed Chinese companies, issued an analyst
report (the "November 22 Report") focusing on then-recent
regulations promulgated by the China Insurance Regulatory
Commission ("CIRC") that restricted the use of equity
incentive compensation plans by insurance intermediaries.
The November 22 Report detailed some relevant points from
the CIRC regulations and noted that, based on OLP's
knowledge, CNinsure had been offering equity incentives to
its sales agents since 2007.   The November 22 Report
further predicted that the regulatory changes would slow
CNinsure's aggressive hiring of sales agents and result in
curtailed revenue growth, and that CNinsure may be forced
to raise commission payments to its sales agents which
would result in increased overall compensation expenses for
the company.

   That same day, CNinsure held a conference call with
analysts and investors during which company representatives
were asked about equity incentive compensation.   CNinsure
representatives characterized the plan as a scorecard akin
to airline mileage programs, and explicitly denied that it
was an equity compensation program.   Lead Plaintiffs allege
that the price of CNinsure's ADSs dropped roughly 13% by
the close of market on November 23, 2010 as a result of the

-6-

November 22 Report – and that CNinsure's misleading representations on the ensuing conference call prevented further decline.

On December 2, 2010, OLP issued another analyst report (the "December 2 Report") offering more details as to how CNinsure compensated its sales agents. OLP concluded in the December 2 Report that CNinsure's plan was no different from an equity-based plan, was a growth-driver for CNinsure, and that the equity incentive compensation earned by CNinsure's sales agents was not properly reflected in the company's financial statements. OLP expressly disagreed with CNinsure's characterization of the plan as a scorecard system, and offered some details about the plan's mechanics, including specifics related to agent eligibility and equity incentive share conversion. Further, OLP opined that sales agents were being recruited with equity incentive shares in an entity that did not legally exist: the sales agents were offered shares in Finestart Holdings Limited ("Finestart"), but OLP was unable to verify the registration of that company in either Hong Kong or China. Lead Plaintiffs allege that the price of CNinsure's ADSs dropped nearly 17% by the close of market on December 2, 2010 as a result of the December 2 Report.

-7-

On December 3, 2010, CNinsure held a conference call with analysts and investors during which Hu addressed the December 2 Report.  In particular, he reiterated that the company's equity incentive compensation plan was a scorecard system that allowed sales agents to accumulate points and participate in rewards programs.  Hu noted that, under certain situations, sales agents could use these points to acquire stock options in CNinsure or CNinsure's affiliated subsidiaries, and that sales agents may become eligible to become full-time employees under the points program.  He also stated that the program should not be recognized as costs under accounting principles and that it was misleading to characterize the program as no different from an equity incentive compensation plan.  In addition, Hu stated that CIRC was aware of and approved CNinsure's scorecard program.

On the subject of Finestart, Hu stated that it was registered in the British Virgin Islands, and that it provided CNinsure and its employees and sales agents with stock trading services; but he repeatedly emphasized that it was independent from CNinsure.  When faced with an analyst question requesting details about Finestart, Hu responded that Finestart had its origins in a company

-8-

called Chengdu Jingshi, with which CNinsure also collaborated, and that Chengdu Jingshi actually had an incentive plan whereby CNinsure sales agents could earn stock.

On the same day, OLP issued a follow-up analyst report (the "December 3 Report") and also published documents supporting its research on CNinsure. The December 3 Report characterized these supporting documents as CNinsure's presentations to existing and prospective sales agents touting the company's compensation plans, and reiterated OLP's belief that CNinsure's financial statements should account for the equity incentive compensation plan described in the presentations. The December 3 Report also highlighted the recent sale of CNinsure stock by two senior executives (not named as defendants in this case) as evidence of an erosion in confidence in the company. Lead Plaintiffs allege that the price of CNinsure's ADSs dropped again by the close of market on December 3, 2010, and that the price of the company fell 24% in response to the December 2 Report and the December 3 Report.

CNinsure responded on December 6, 2010 with a press release entitled "Statement of Clarification from CNinsure." The press release again stated that the equity

-9-

incentive compensation plan described by OLP was nothing more than a scorecard, and that Finestart had no economic ties to CNinsure.   The press release also disclaimed CNinsure's authorship of any presentations regarding an equity incentive compensation plan and claimed that any contrary representation was a misunderstanding by lower level affiliates.   Later in the same day, OLP published another analyst report and supporting documents purporting to demonstrate that the presentations regarding the equity incentive compensation plan originated from CNinsure's company server.

On December 10, 2010, CNinsure hosted an event in China for analysts and investors during which it conducted a presentation (the "December 10 Presentation") addressing compensation for CNinsure sales agents and Finestart.   On the topic of sales agent compensation, the December 10 Presentation stated that the plan did not involve equity incentive compensation (commissions are paid in cash), and OLP's assertion that sales agents could convert their compensation into CNinsure shares that CNinsure was obligated to buy back at a fixed price was inaccurate.   The December 10 Presentation stated that the points awarded to sales agents under the program did not have any monetary

-10-

value.   Further,  the  December  10  Presentation  relayed  that CNinsure  investigated  the  presentation  cited  by  OLP  and determined  that  it  was  not  an  official  document  produced  or approved  by  CNinsure,  and  that  it  was  located  on  an internet  forum  provided  by  the  company  to  sales  agents  and not  the  company's  official  website.    On  the  topic  of Finestart,  the  December  10  Presentation  again  reiterated that  Finestart  was  a  BVI-registered  company,  and  that  it was  independent  from  CNinsure.

On  December  13,  2010,  OLP  published  another  analyst report  (the  "December  13  Report")  and  supporting  documents regarding  the  disputed  presentation  on  sales  agent compensation.    The  December  13  Report  refuted  CNinsure's contention  that  the  presentation  was  unauthorized,  and pointed  to  a  number  of  documents  it  suggested  demonstrated that  the  existence  of  an  equity  incentive  compensation  plan was  common  knowledge  in  China,  including:  a  news  article from  2007  discussing  two  types  of  equity  incentives  at CNinsure;  articles  published  on  CNinsure's  website  and  Hu's statements  regarding  equity  incentives;  and  two  essays written  in  2010  by  CNinsure  employees  regarding  their  views on  equity  incentives.    The  December  13  Report  also  raised questions  about  Finestart's  role  in  the  equity  incentive

compensation plan: specifically, if sales agents were offered shares in Finestart with a fixed value as part of the plan, how many shares were outstanding and what was the price per share?

As with previous OLP reports, the December 13 Report focused on CNinsure's apparent promise to its sales agents to buy back the equity incentive shares at a fixed price at any time – a feature that, as noted above, CNinsure repeatedly denied existed.  The December 13 Report also revealed a new development: links and images on CNinsure's website relating to the equity incentive presentation recently had been disabled.  OLP opined that this evidenced CNinsure's intent to impede research on this issue.  Lead Plaintiffs allege that the price of CNinsure's ADSs dropped again by the close of market on December 14, 2010 and December 15, 2010, and that the price of the company fell another 20.4% in response to the December 13 Report.

On January 6, 2011, OLP published an analyst report (the "January 6 Report") and supporting documents reporting more details on Finestart.  In particular, the January 6 Report outlined OLP's belief that equity incentive shares earned by CNinsure's sales agents could be converted into ownership in Finestart, a detail that again raised

-12-

questions about Finestart's relationship to CNinsure.   OLP reiterated in the January 6 Report its belief that CNinsure's equity incentive compensation plan should be (but had not been) reflected in the company's financial statements, as well as its belief that CNinsure was continuing to impede research by disabling links and removing documents from its website.

C. CNINSURE'S NOVEMBER 21, 2011 PRESS RELEASE, AND THE CLOSE OF THE CLASS PERIOD

On November 21, 2011, CNinsure issued a press release detailing its financial results for the third quarter of 2011.   While the company reported an 18.9% increase in total net revenues for that period, this growth was lower than the year-over-year growth CNinsure had reported in past quarters.   The press release contained a statement from CNinsure's chief executive officer noting the company's dependence on a people-driven sales model, and that rising labor costs and operating expenses placed that model under increasing pressure.   Further, the release reported a 40.5% increase in commission and fee expenses for the third quarter of 2011 over the third quarter of 2010.   CNinsure attributed this to an increase in the rate of commissions paid to sales agents.   Lead Plaintiffs

allege that the price of CNinsure's ADSs dropped again on November 22, 2011 and November 23, 2011, and that the price of the company fell nearly 26% in response to this press release.   In total, Lead Plaintiffs allege that the price of CNinsure's ADSs dropped more than 78% as investors learned the truth about the company's equity incentive compensation plan.

D. SALES OF CNINSURE ADSs BY CNINSURE EXECUTIVES

During the Class Period, a number of CNinsure executives sold CNinsure ADSs, resulting in proceeds in excess of $34 million.   In particular, Hu and Lai controlled another entity called Kingsford Resources Limited that sold 955,057 shares of CNinsure ADSs during the class period for proceeds of more than $25.2 million, and two other CNinsure executives not named as defendants sold ADSs between November 24, 2010 and December 1, 2010 (between the first and second OLP reports) for combined proceeds of more than $1.3 million.

E. CNINSURE'S ACQUISITIONS FROM CHENGDU JINGSHI

In November 2010, analysts at Piper Jaffray & Co. ("Piper Jaffray") raised concerns about CNinsure's acquisition of interests in insurance agencies from Chengdu Jingshi – the same company that invested in Finestart.

Specifically, Piper Jaffray questioned CNinsure's relationship with Chengdu Jingshi based in large part on the fact that CNinsure appeared to be paying Chengdu Jingshi inflated prices for insurance agencies that Chengdu Jingshi had purchased for comparatively small amounts of money.

In addition, Piper Jaffray questioned CNinsure's reported margins during the Class Period, noting that they were significantly higher than those of its competitors. CNinsure attributed its higher margins to the fact that it was larger than its competitors, which allowed it to earn bonus commissions based on sales volume and service quality. However, CNinsure's IPO prospectus filed with the SEC in 2007 listed bonus commissions as accounting for 1.1% of its total commissions in 2006. Both OLP and Piper Jaffray questioned this explanation, with Piper Jaffray further questioning CNinsure's transparency in its disclosures.

F. CNINSURE'S PROPOSED GOING PRIVATE TRANSACTION

On May 16, 2011, CNinsure announced that it had received a non-binding proposal from a consortium of investors (including Kingsford Resources Limited, controlled by Hu and Lai) to acquire all outstanding

-15-

ordinary shares of the company.  However, on September 15, 2011, CNinsure issued a press release announcing that the consortium had withdrawn its proposal, citing a challenging deal environment.  The same day, The Motley Fool published an article raising questions about the failed buyout, suggesting that the deal appeared to be too attractive to the potential buyers to fall through.  On October 21, 2011, Hu and another non-defendant executive resigned from CNinsure.  The disclosed reasons were not related to the potential buyout.  In the ensuing months, The Financial Times published two articles providing evidence that the buyout fell through because the consortium uncovered accounting irregularities while conducting due diligence on CNinsure.

## II. **LEGAL STANDARD**

### A. STANDARD FOR DISMISSAL UNDER RULE 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

-16-

the defendant is liable for the misconduct alleged." Id. A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. The task of a court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." In re Initial Pub. Offering Sec. Litig., 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (quoting Levitt v. Bear Stearns & Co., Inc., 340 F.3d 94, 101 (2d Cir. 2003)) (internal quotation marks omitted), aff'd Tenney v. Credit Suisse First Boston Corp., Nos. 05-3430-CV, 05-4759-CV, 05-4760-CV, 2006 WL 1423785 (2d Cir. May 19, 2006). A court must accept as true all well-pleaded factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

Plaintiffs claiming securities fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") by "stat[ing] with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); see ATSI Commnc'ns, Inc. v. Shaar

-17-

Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).   A complaint alleging securities fraud must also meet the requirements of the Private Securities Litigation Reform Act ("PSLRA"), which requires that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is based on information or belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b).   When alleging fraudulent acts or schemes to defraud, plaintiffs must plead facts demonstrating a "strong inference" of scienter under the PSLRA.   See In re Alstom SA, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005).

B. THE EXCHANGE ACT

In pertinent part, Section 10(b) declares it unlawful for any person, directly or indirectly, by the use of any means of interstate commerce, the mails, or national securities exchange:

> to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

-18-

15 U.S.C. § 78j(b).

Rule 10b-5, promulgated by the SEC to implement Section 10(b), "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 534 (2d Cir. 1999). Under Rule 10b-5, it is unlawful for any person, directly or indirectly, by the use of any means specified in Section 10(b):

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Section 10(b) operates as a "broad" prohibition against manipulation, whether in the form of false statements or market manipulation. United States v. Royer, 549 F.3d 886, 900 (2d Cir. 2008); see ATSI, 493 F.3d at 99. Lead Plaintiffs in this case allege misrepresentations or omissions of material fact. To state a claim for misrepresentations, a plaintiff must allege that the defendant "(1) made misstatements or omissions of material

-19-

fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." Id. at 105.

### 1. Misstatements or Omissions of Material Fact

In order to satisfy Rule 9(b) and PSLRA pleading requirements, "[a] securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Id. at 99. An omission is actionable "only when the [defendant] is subject to a duty to disclose the omitted facts." In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993). Although "Rule 10b-5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a 'duty to be both accurate and complete.'" Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co., 753 F. Supp. 2d 166, 180 (S.D.N.Y. 2010) (quoting Caiola v. Citibank, N.A., N.Y., 295 F.3d 312, 331 (2d Cir. 2002)).

Whether a misstatement or omission is material is "an inherently fact-specific finding . . . that is satisfied

when a plaintiff alleges a statement or omission that a reasonable investor would have considered significant in making investment decisions." Litwin v. Blackstone Grp. L.P., 634 F.3d 706, 716-17 (2d Cir. 2011) (internal quotation marks and citations omitted). Since materiality is a mixed question of law and fact, "a complaint may not properly be dismissed . . . on the ground that the alleged misrepresentations or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) (internal quotation marks omitted).

### 2. Scienter

Scienter, "a mental state embracing intent to deceive, manipulate, or defraud," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (internal quotation marks omitted), is a required element of fraud, whether accomplished by misrepresentation or market manipulation. In order to plead a "strong inference" of scienter, plaintiffs must allege with particularity either (a) "facts to show that the defendant had both motive and opportunity to commit fraud[;]" or (b) "facts that constitute strong

-21-

circumstantial evidence of conscious misbehavior or recklessness." Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001) (internal quotation marks omitted). In assessing whether a plaintiff has pled scienter, courts consider whether all the facts, taken together, give rise to an inference of scienter that is "at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314.

A complaint has sufficiently alleged "motive and opportunity to commit fraud" if it pleads facts showing that the defendant "benefited in some concrete and personal way from the purported fraud." Novak v. Kasaks, 216 F.3d 300, 307-08 (2d Cir. 2000). "Motives that are common to most corporate officers . . . do not constitute 'motive' for the purpose[]" of establishing scienter. ECA, 553 F.3d at 198. Examples of general motives which fail to support a strong inference of scienter include "(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation." Kalnit, 264 F.3d at 139. In order to plead opportunity, a plaintiff must "show that the individual defendants possessed 'the means and likely prospect of achieving concrete benefits by the means alleged.'" In re Take-Two

-22-

Interactive Sec. Litig., 551 F. Supp. 2d 247, 297 (S.D.N.Y. 2008) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994)).  The opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer.  See, e.g., In re AstraZeneca Sec. Litig., 559 F. Supp. 2d 453, 468 (S.D.N.Y. 2008); Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006) ("Regarding the 'opportunity' prong, courts often assume that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired.").

Where plaintiffs fail to allege scienter through motive and opportunity, the securities fraud claim may still be sufficiently stated by allegations demonstrating "strong circumstantial evidence of conscious misbehavior or recklessness," Kalnit, 264 F.3d at 138-39 (internal citations omitted), but "'the strength of the circumstantial allegations must be correspondingly greater,'" id. at 142 (quoting Beck v. Mfrs. Hanover Trust Co., 820 F.2d 46, 50 (2d Cir. 1987)).  A plaintiff pleading the conscious misbehavior or recklessness theory of scienter must allege conduct which is "'highly unreasonable

-23-

and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" Id. at 142 (quoting Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000)). Specifically, a complaint sufficiently pleads scienter where it alleges defendants had "'knowledge of facts or access to information contradicting their public statements.'" Id. (quoting Novak, 216 F.3d at 308). Sufficient evidence of recklessness exists if the factual allegations demonstrate that defendants (1) possessed knowledge of facts or access to information contradicting their public statements, or (2) "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." Novak, 216 F.3d at 308.

Finally, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, 551 U.S. at 323. A strong inference of scienter "must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. at 314.

3. Reasonable Reliance and Loss Causation

-24-

A plaintiff claiming securities fraud under Section 10(b) and Rule 10b-5 must also establish that it reasonably relied on the defendant's alleged misrepresentations or omissions, and that the fraud caused the plaintiff's loss. Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir. 2003). "In assessing the reasonableness of a plaintiff's alleged reliance, [courts] consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." Id.

Reliance may be presumed in two circumstances. First, "in the case of omissions, reliance on the omitted information may be presumed where such information is material." Black v. Finatra Capital, Inc., 418 F.3d 203, 209 (2d Cir. 2005). Second, the "fraud on the market" theory creates a presumption of reliance if the securities were traded in an efficient market — i.e., an "open and developed" market in which the price of securities are, in theory, determined by all available information. Basic Inc. v. Levinson, 485 U.S. 224, 241-42 (1988) (internal quotation marks omitted); In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 508 (S.D.N.Y. 2005).

-25-

Loss causation is not subject to the heightened pleading standards of Rule 9(b) or the PSLRA. See In re Citigroup Inc. Sec. Litig., 753 F. Supp. 2d 206, 234 (S.D.N.Y. 2010) ("Loss causation need not be pled with particularity."). Instead, a short and plain statement suffices, as required under Rule 8 of the Federal Rules of Civil Procedure. Loss causation requires a link between the alleged misconduct and the ultimate economic harm suffered by the plaintiff, and a plaintiff must claim that "the loss [was] foreseeable and that the loss [was] caused by the materialization of the concealed risk." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005).

## III.  DISCUSSION

Defendants argue that the Court must dismiss the Amended Complaint because Lead Plaintiffs have failed to adequately plead 1) the falsity of Defendants' statements, 2) scienter, and 3) loss causation.[3]  Defendants' papers posit an alternate theory of the case: that the equity incentive compensation plan detailed in the various OLP reports really was nothing more than a scorecard program,

---

[3]  With the exception of one stray mention on the next-to-last page of their reply brief, Defendants do not challenge the materiality of the statements in question.  Defendants also do not contest that the statements were made in connection with the purchase or sale of securities, or that Lead Plaintiffs relied on them.  Thus, the Court need not address these issues.

-26-

just as Defendants described it, and, as such, Lead
Plaintiffs also cannot demonstrate that CNinsure's stock
drop was at least in part caused by a switch from an equity
incentive compensation plan to a cash compensation plan
because that alleged switch never occurred.  Of course, if
true, Defendants' theory would be highly damaging to Lead
Plaintiffs' claims, and could very well carry the day at a
trial.  But Defendants' arguments are insufficient at this
stage.  Insofar as these contentions appear to take issue
with Lead Plaintiffs' allegations, they serve merely to
confirm that material factual disputes exist that cannot be
resolved on a motion to dismiss.  Thus, the Court is
persuaded that Lead Plaintiffs have adequately alleged
fraud in this matter.

## A. FALSITY

Defendants argue that Lead Plaintiffs have failed to
plead falsity because CNinsure's statements regarding the
particulars of its compensation program provide a more
likely explanation than OLP's "mischaracterizations."
(Dkt. No. 14 at 15.)  Specifically, Defendants note that
CNinsure has publicly disclosed that it has an
Entrepreneurial Agent Program, a Share Incentive Plan, and
the so-called scorecard program, and that in revealing an

"undisclosed" equity incentive compensation plan, it is more plausible that OLP in fact mischaracterized the existing scorecard program and conflated it with the other two programs, which have equity incentives. Defendants further attempt to cast doubt upon OLP's conclusions by highlighting the fact that its employees may have held positions in CNinsure's stock that could represent a conflict of interest.

On this point as well, Defendants' arguments are premature. Defendants' efforts amount to an appeal to the referee to call a foul while the opposing team is still announcing its lineup and taking the field. Defendants' arguments regarding the truthfulness of CNinsure's statements about the scorecard program and the nature of the deleted presentation – i.e., that the presentation was unauthorized (and that it would be easy for a third party to reproduce the company logos featured on the presentation), and that its deletion was routine – amount to fact-based disputes that the Court will not credit on a motion to dismiss. See In re Advanced Battery Techs., Inc. Sec. Litig., No. 11 Civ. 2279, 2012 WL 3758085, at *9 (S.D.N.Y. Aug. 29, 2012) (noting that defendants' argument predicated on assertion "that the things they said were

-28-

true . . . . is not an appropriate argument to make on a motion to dismiss a Complaint that alleges falsity; it is a defense on the merits").

Moreover, the Court is not convinced that Defendants have demonstrated that CNinsure's explanation is more plausible than Lead Plaintiffs' theory of the case. Defendants' attempts to rub dirt on the OLP reports are unavailing. The Court cannot find, based on the Defendants' examples, that it is more plausible than not that OLP was so confused and/or disingenuous in its description that it simply conjured the details of the equity incentive compensation plan, and that Defendants, in denying the existence of the plan - including by deleting from the CNinsure server a presentation with CNinsure logos on it regarding this alleged plan - were in the right. Again, these matters are all fraught with factual issues which either are strongly contested by Lead Plaintiffs' allegations, or about which Defendants' theory would require the Court to make findings based on an inadequate evidentiary record, or to determine which of two competing presentations is more credible.

To begin, Defendants' argument that OLP simply confused CNinsure's disclosed equity plans with the

scorecard plan is based on two examples in the supporting documentation cited by the OLP reports that could appear to be in reference to either the Entrepreneurial Agent Program or the Share Incentive Plan instead of an undisclosed equity incentive compensation plan.  Defendants point out that a quote from Hu describing equity compensation uses the word "entrepreneurs," and further point out that one of the articles describing the supposed undisclosed plan was written by an "entrepreneur team leader" who would have been eligible for the Entrepreneurial Agent Program.  (Dkt. No. 14 at 16-17.)   But this highly selective exercise ignores the host of other materials OLP relied on in formulating its reports (in addition to the disputed presentation).  It fails entirely, for example, to address allegations regarding the role of Finestart.  (Tellingly, Defendants do not point to any disclosures regarding the Entrepreneurial Agent Program or the Share Incentive Plan that relate to shares in Finestart.)

Put another way, these two discrepancies, in the face of the remaining supporting documentation, do not make it more plausible than not that the undisclosed equity incentive compensation plan did not in fact exist – a necessary predicate to finding that Defendants' statements

were not false.  Further, Defendants' suggestion that OLP's analysis should be discounted or dismissed because OLP disclosed that it may have a conflict of interest is premature.  See Lewy v. SkyPeople Fruit Juice, Inc., 11 Civ. 2700, 2012 WL 3957916, at *13 (S.D.N.Y. Sept. 10, 2012) (holding, in the context of a challenge to plaintiffs' reliance on a report issued by a potential short-seller, that "[a] motion to dismiss is not the proper vehicle to test the credibility of witnesses or the manner in which the plaintiffs will attempt to prove their allegations").

In this case, Lead Plaintiffs have done what the law requires: they have alleged that CNinsure's statements regarding its compensation of sales agents were false, the reason why the statements were misleading, and the facts that support these allegations.  See In re Advanced Battery Techs., Inc. Sec. Litig., 2012 WL 3758085, at *10. Contrary to Defendants' arguments, this factual recitation includes CNinsure's statements from early in the Class Period, including the March 2, 2010 Press Release, the May 7, 2010 Annual Report, and the July 15, 2010 Registration statement.

Plaintiffs allege that the positive statements about CNinsure's growth in the March 2, 2010 Press Release, as well as the representations in the May 7, 2010 Annual Report, and the July 15, 2010 Registration statement that sales agents are "only compensated by commissions" were misleading because these statements misrepresented and failed to disclose the presence of the equity incentive compensation plan, and that this undisclosed plan was in fact responsible for CNinsure's positive future statements. These statements are arguably examples of the longstanding maxim, "Some literally accurate statements can, 'through their context and manner of presentation, [become] devices which mislead investors." Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC, 595 F.3d 86, 92 (S.D.N.Y. 2010) (quoting McMahan & Co. v. Wherehouse Entm't, Inc., 900 F.2d 576, 579 (2d Cir. 1990). That Lead Plaintiffs have relied in large part on the various OLP reports and supporting documentation in alleging these and other misstatements and omissions is not fatal to their claims.

B. SCIENTER

Piggybacking on their theory that their explanations for this whole episode is more plausible than Lead

-32-

Plaintiffs' allegations, Defendants argue that Lead Plaintiffs have failed to plead the requisite strong inference of scienter, characterizing the multi-faceted allegations in the Amended Complaint as little more than a "kitchen sink." (Dkt. No. 14 at 18.) Specifically, Defendants argue that: (1) Lead Plaintiffs' allegations that Defendants knew or recklessly disregarded that their statements were false and misleading are simply too broad and conclusory; (2) the insider stock sales are not unusual and therefore do not support scienter; (3) CNinsure's removal of documents from its server does not support scienter because the documents were unauthorized; (4) CNinsure's July 2010 secondary offering does not support scienter because it occurred months before the first OLP report; and (5) CNinsure's alleged failure to properly account for the equity incentive compensation plan does not support scienter.

Lead Plaintiffs respond that they have adequately pled a strong inference of scienter because they have alleged that defendants have acted with conscious misbehavior or recklessness, and, in the alternative, they have alleged Defendants' motive and opportunity. The question before the Court with respect to scienter is, "'When the

-33-

allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" ECA, 553 F.3d at 198 (quoting Tellabs, 551 U.S. at 326. Under either theory – demonstration of conscious misbehavior or recklessness or motive and opportunity – the Court answers that question in the affirmative.

Lead Plaintiffs have presented strong circumstantial evidence that Defendants acted with conscious misbehavior or recklessness. As the Second Circuit noted in Novak:

> [S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.

216 F.3d at 308. Lead Plaintiffs clearly allege that several members of CNinsure's senior management knew of the undisclosed equity incentive compensation plan. The Amended Complaint recounts a number of statements by a number of CNinsure executives promoting such a plan dating back to 2007, thus rendering the repeated omissions and outright denials during the Class Period – in the form of public filings, press releases, presentations, and

statements – knowingly or recklessly false.  See Ho v. Douyuan Global Water, Inc., 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012) ("'Knowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued.'") (quoting In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 490 (S.D.N.Y. 2004).[4]

Defendants' protestations to the contrary rely heavily on a repackaged version of their falsity argument detailed above.  In particular, Defendants again argue that the entire dispute amounts to little more than OLP's conflation of the scorecard program and CNinsure's Entrepreneurial Agent Program, and again point to the same example where Hu specifically referenced "entrepreneurs" when discussing equity incentives.  (See Dkt. No. 19 at p.8.)  But they

---

[4]   The intent of company executives acting with scienter can be imputed to the company itself.  See City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp., 875 F. Supp. 2d 359, 369 (S.D.N.Y. 2012); Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008) ("In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant. But it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant.").

again ignore the numerous other examples of statements by CNinsure executives promoting such a plan (including a statement by Hu regarding equity incentives in the very next paragraph that does not mention entrepreneurs). (See Dkt. No. 12 ¶ 68 at 38 (Appendix IV bullet point and quote).)

Just as it fell short in the context of falsity, Defendants' argument is insufficient to amount to a more compelling inference regarding scienter than the one proffered by Lead Plaintiffs. See In re Ambac Fin. Grp., Inc. Sec. Litig., 693 F. Supp. 2d 241, 269-70 (S.D.N.Y. 2010) (holding that, while "defendants' characterization of events is certainly one inference that can be drawn from the alleged facts . . . . taking the facts in the light most favorable to the plaintiffs, this does not amount to a more compelling inference than that proffered by plaintiffs based on the facts alleged"). Because it is plausible that the undisclosed equity incentive compensation plan actually exists and that most, if perhaps not all, of the executives' statements cited by OLP and mentioned in the Amended Complaint in fact referred to that program, it follows that subsequent characterizations of the plan as little more than a scorecard with no equity component (as

on CNinsure's conference calls on December 2, 2010 and December 3, 2010, and in its press release dated December 10, 2010), or failures to mention the plan at all (as in the March 2, 2010 Press Release, the May 7, 2010 Annual Report and the July 15, 2010 Registration Statement) were knowingly or recklessly misleading.

In light of this discussion, Defendants' argument that the allegations are too broad and conclusory amounts, ironically, to little more than boilerplate. The Court finds a strong inference of scienter because Lead Plaintiffs have adequately alleged that defendants were aware of information that contradicted their statements. See, e.g., Heller v. Golding Restructuring Fund, L.P., 590 F. Supp. 2d 603, 622 (S.D.N.Y. 2008) (holding that where plaintiff alleged that defendants "had knowledge of facts . . . that explicitly contradicted their public statements . . . . [t]hese allegations alone are enough to satisfy the pleading requirement for scienter"); In re Moody's Corp. Sec. Litig., 599 F. Supp. 2d 493, 515 (S.D.N.Y. 2009) (finding that plaintiffs provided "ample allegations" to demonstrate corporate scienter where they "alleged specific statements indicating that various top officials,"

including the CEO, had requisite knowledge of the alleged fraud).[5]

Moreover, Lead Plaintiffs' allegations regarding Piper Jaffray's concerns over the valuation of CNinsure's acquisitions from Chengdu Jingshi, the aborted going private transaction that raised questions about CNinsure's accounting practices, and the resignation and retirement of company insiders alleged to have been involved in the scheme (including one who retired on the same day that the first OLP report was released) all contribute to the inference of scienter.  See In re Scottish Re Grp. Sec. Litig., 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007) (considering a number of allegations, including GAAP violation and employee resignations, in finding that plaintiffs properly pled scienter); Ho, 887 F. Supp. 2d at 575 (finding that executive's resignation at approximately the same time that the accounting difficulties at his company and a subsidiary became public, while insufficient

---

[5]  The parties dispute the significance of CNinsure's removal of images and disabling of links relating to the equity incentive compensation plan from its server.  While the timing of the material's removal - in addition to the fact that it existed on CNinsure's servers in the first place and featured the company's logo - raises suspicions, the Court also recognizes the ease with which unauthorized documents can be produced and disseminated on a publicly accessible internet forum.  At best, this evidence weakly supports scienter, but the Court need not rely on this point in finding a strong inference of scienter and thus declines to probe further into this dispute.

-38-

standing alone, contributed to a strong inference of scienter "when considered in conjunction with the rest of Plaintiffs' allegations").

While perhaps not dispositive, the examples described above support Lead Plaintiffs' theory that CNinsure, in part through its relationship with Chengdu Jingshi, improperly accounted for the costs associated with compensating its sales agent, and that certain CNinsure executives were aware of this wrongful action and profited by it through the secondary offering and their sales of stock. Put another way, this is not a case of "'GAAP violations or accounting irregularities, standing alone. . . .'" ECA, 553 F.3d at 200 (quoting Novak, 216 F.3d at 309). In total, Lead Plaintiffs' roadmap provides enough detail for this case to proceed. See Dodona I, LLC v. Goldman, Sachs & Co., 847 F. Supp. 2d 624, 645 (S.D.N.Y. 2012) ("In sum, the Court finds in its 'practical judgment' that the 'whole factual picture painted by the [C]omplaint' gives rise to a strong inference of scienter.") (quoting Slayton v. American Express Co., 604 F.3d 758, 775 (2d Cir. 2010).

Lead Plaintiffs have also pled scienter by sufficiently demonstrating motive and opportunity.[6] Defendants' remaining arguments – that the July 2010 secondary offering and insider stock sales do not support a strong inference of scienter – fail for some of the same reasons already discussed. None of the allegations standing alone creates a strong inference of scienter, just as no single beam forms the foundation for an entire house – but collectively they sufficiently support Lead Plaintiffs' claims.

First, the Court finds that the July 2010 secondary offering can provide a motive for fraud. See Duncan v. Pencer, No. 94 Civ. 321, 1996 WL 19043, at *14 (S.D.N.Y. Jan. 18, 1996) (holding that misstatements that artificially inflate a stock price in advance of a public offering are sufficient to support scienter on a motion to dismiss). Lead Plaintiffs allege that by concealing the equity incentive compensation plan from the public in the March 2, 2010 Press Release, the May 7, 2010 Annual Report and the June 15, 2010 Registration Statement, Defendants were able to raise $109.6 million in the offering that they

---

[6]   The Court need only focus on the question of motive, as the opportunity to commit fraud can be assumed. See Dodona I, 847 F. Supp. 2d at 638.

-40-

otherwise would not have been able to if they presented a more complete and accurate financial snapshot.  Because the Court has already rejected Defendants' argument that the press release and the two subsequent public filings are not material misstatements or omissions, the Court likewise rejects Defendants' corollary argument that the secondary offering cannot provide motive for fraud because Defendants' misstatements and omissions (if any) did not begin until more than four months later in November 2010.

Except for the fact that they again erroneously attempt to limit the relevant time period to post-November 2010, Defendants raise their strongest argument in contending that Lead Plaintiffs' allegations of insider stock sales do not support motive in this case.  Lead Plaintiffs allege that, during the Class Period, CNinsure insiders collectively sold more than 1.3 million ADSs for proceeds exceeding $34 million.  Hu and Lai, through their control of Kingsford Resources Limited, received more than $25 million of these proceeds through sales that occurred between March 2010 and October 2010.  Two other executives not named as defendants collectively pocketed roughly $1.3 million in proceeds from sales that occurred after the November 22, 2010 OLP Report.  Defendants claim that there

is no indication that these sales were "unusual," and thus they do not support scienter.

The Court notes that the factors usually considered in determining whether trading activity is unusual – including the volume of the stock traded, the profit earned, the identity of the traders, and the timing of the trades – appear in this case to cut in both directions. See In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74-75 (2d Cir. 2001). While Hu and Lai and two other executives did sell stock during the class period, Ge is not alleged to have done so. Further, the most suspicious sales – those that occurred after the first OLP report – were relatively small in amount, and Lead Plaintiffs do not allege that Hu or Lai sold stock in response to that report. And Defendants correctly note that all sales cited by Lead Plaintiffs are presented without context of how they relate to those sellers' total holdings or trading strategy outside the Class Period. See In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 444-45 (S.D.N.Y. 2005) (finding that allegations of insider stock sales were not unusual where sales were not clustered at the end of the period, only two of the individual defendants were alleged to have sold, and there was no other context given for the trading behavior).

-42-

On the other hand, none of those considerations
prevent a finding of scienter: motive "'is adequately
alleged where the plaintiffs allege that the defendants
sold their own shares while at the same time
misrepresenting corporate performance in order to inflate
stock prices,'" In re Refco, Inc. Sec. Litig., 503 F. Supp.
2d 611, 646 (S.D.N.Y. 2007) (quoting Marcus v. Frome, 329
F. Supp. 2d 464, 473 (S.D.N.Y. 2004)), and all of the sales
Lead Plaintiffs cite occurred after the March 2, 2010 press
release hyping CNinsure's performance without disclosing
anything regarding equity compensation. See Stevelman v.
Alias Research Inc., 174 F.3d 79, 86 (2d Cir. 1999)
(finding a strong inference of scienter where "[s]ome of
the sales occurred after the representations were made" and
further finding that "the statements that continued to be
made after the sales that followed the earlier statements
could well be probative of an intent to keep the stock
price high in order to avoid detection of the alleged
fraud").

Ultimately, resolving doubts and drawing all
reasonable inferences in favor of the plaintiff, the Court
is persuaded that these sales qualify as unusual. The
sales by two executives following the November 22, 2010 OLP

-43-

Report, although comparatively small in amount, can be considered unusual because of their timing: they appear to be a direct result of public concerns regarding the previously undisclosed equity compensation plan (which the company continued to deny).   Cf. In re BISYS Sec. Litig., 397 F. Supp. 2d at 444-45 (declining to find scienter where sales were "not clustered at [the end of the class period], when insiders theoretically would have rushed to cash out before the fraud was revealed and stock prices plummeted"). And the sales by Hu and Lai, although not specifically tied to the OLP reports, can be considered unusual based on their comparative size and because Hu in particular was responsible for misstatements and omissions both early and late in the class period and thus directly benefited from them.   See Stevelman, 174 F.3d at 86 (weighing the fact that "the 'opportunity' embodied in the fact that the insider . . . who benefitted from stock sales during the misrepresentation period actually made the misrepresentations").

Moreover, the fact that multiple CNinsure executives sold stock outweighs the fact that one (Ge) did not.   See In re Quintel Entm't Inc. Sec. Litig., 72 F. Supp. 2d 283, 296 (S.D.N.Y. 1999) (finding that insider sales by

-44-

multiple executives supported scienter and distinguishing Acito v. IMCERA Group, 47 F.3d 47 (2d Cir. 1995) because in that case only one executive was alleged to have sold stock). That Ge did not sell stock while other CNinsure executives did cuts against granting Defendants' motion in another respect: to the extent any significance is attached to that difference, the reasons underlying it are not readily ascertained absent direct discovery from the individuals involved explaining their conduct. Combined, these circumstances do not present a smoking gun, but they tip the balance in Lead Plaintiffs' favor. See In re Oxford Health Plans, Inc., 187 F.R.D. 133, 140 (S.D.N.Y. 1999) ("When all of the circumstances surrounding the [] trading are known, they may ultimately defeat the plaintiffs' claims of individual insider trading and fraud. At this point, however, the plaintiffs' allegations of unusually large insider trades at suspicious times are sufficient to create, along with the other allegations, a strong inference of scienter.").

C. LOSS CAUSATION

Defendants contend that Lead Plaintiffs failed to plead loss causation because they have not alleged facts showing that CNinsure shifted from an equity incentive

-45-

compensation plan to a cash compensation plan, or that such a shift caused the decreased revenue growth and increased expenses that CNinsure reported in its November 21, 2011 Press Release. Lead Plaintiffs respond that the Amended Complaint adequately alleges loss causation because the November 21, 2011 Press Release attributed CNinsure's financial performance in part to exactly what OLP warned about, namely, that the company's success was predicated on an undisclosed equity incentive compensation plan that allowed it to grow its sales force while keeping reported expenses low, and that any changes to the sales agent compensation model (either due to CIRC regulations or from internal pressure at CNinsure) would negatively impact CNinsure's growth.[7]

The Court finds that the November 21, 2011 Press Release supports loss causation in this case because it contained several statements linking CNinsure's decreased growth to pressures on and changes to its model of compensating its sales agents. Specifically, the November

_____

[7] The Court declines Defendants' invitations to depart from existing standards and follow the Fourth Circuit in adopting a heightened pleading standard for loss causation. In the Southern District of New York, "[l]oss causation is not subject to the heightened pleading standards of Rule 9(b) or the PSLRA." Dodona I, 847 F. Supp. 2d at 639; see also Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) ("There is no heightened standard for pleading loss causation.").

-46-

21, 2011 Press Release notes that, historically, CNinsure's "business growth has relied primarily on a people-driven sales model," but that "with rising labor costs and operating expenses, this sales model and the sustainability of our long-term growth is increasingly under pressure." (Dkt. No. 12 Ex. 10 at 1.)   In addition, the press release lists a 40.5% increase in "[c]ommissions and fees expenses" for the third quarter of 2011 as compared to the third quarter of 2010, which "largely tracked the increase in the rate of commissions paid to sales agents." (Id. at 2.)

While this language does not explicitly disclose in flashing neon lights a switch from an equity model to an all-cash model, it nevertheless supports the inference that CNinsure's compensation model had shifted – or CNinsure's accounting of the model had shifted – following OLP's disclosure of CNinsure's equity incentive compensation plan and that its disclosed costs rose as a result.   See Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (noting that no court addressing the loss causation pleading standard requires "a corrective disclosure be a 'mirror image' tantamount to a confession of fraud"); see also In re Initial Public Offering Sec. Litig., 544 F. Supp. 2d at 289 ("[T]here is no requirement

-47-

that the disclosure take a particular form or be of a
particular quality."). Thus, this disclosure falls
squarely within the "zone of risk" concealed by CNinsure's
misrepresentations and omissions regarding the manner in
which its sales agents were compensated, and thus satisfies
the element of loss causation. See Lentell, 396 F.3d at
173 ("[T]o establish loss causation, 'a plaintiff must
allege . . . that the subject of the fraudulent statement
or omission was the cause of the actual loss suffered[.]'")
(quoting Suez Equity Investors, L.P. v. Toronto-Dominion
Bank, 250 F.3d 87, 95 (2d Cir. 2001)); Freudenberg, 712 F.
Supp. 2d at 202 ("A risk allegedly concealed by defendants
which materialized and arguably caused the decline in
shareholder value suffices.").[8]

---

[8]   Defendants correctly note that the November 21, 2011 Press Release
offers a number of other factors to explain CNinsure's decrease in
growth, including "prevailing macroeconomic turmoil" and "[h]igh
inflation." (Dkt. No. 14 at 11 (quoting Dkt. No. 12 Ex. 10 at
1).) But, that other factors may be in part responsible for the drop
in stock price does not break the chain of loss causation in a motion
to dismiss. See In re Bear Stearns Cos., Inc., Sec., Derivative, &
ERISA Litig., 763 F. Supp. 2d 423, 507 (S.D.N.Y. 2011) ("[A]t the
motion to dismiss stage, the [complaint] need not rule out all
competing theories for the drop in [defendant's] stock price; that is
an issue to be determined by the trier of fact on a fully developed
record."); see also Gould v. Winstar Commc'ns, Inc., 692 F.3d 148, 162
(2d Cir. 2012) (holding that a portion of a stock drop may be
attributable to forces other than the alleged fraud, but that "these
facts, if established, hardly foreclose the reasonable inference that
some part of the decline was substantially caused by the disclosures
about the fraud itself" and thus that loss causation is satisfied).

Defendants rely heavily on Solow v. Citigroup, Inc., No. 10 Civ. 2927, 2012 WL 1813277 (S.D.N.Y. May 18, 2012), aff'd 507 F. App'x 81 (2d Cir. 2013), and Kuriakose v. Federal Home Loan Mortgage Corp., No. 08 Civ. 7281, 2011 WL 1158028 (S.D.N.Y. Mar. 30, 2011) to support their argument that Lead Plaintiffs have failed to connect the alleged fraudulent statements with the alleged materialization of risk. Both cases are distinguishable.

In Solow, plaintiff alleged that Citigroup took a series of actions in response to its lack of capitalization and liquidity (and that the market reacted negatively based on this belief), but the court found that plaintiff could not establish loss causation because he "fail[ed] to adequately link these events to the risks [d]efendants allegedly concealed." 2012 WL 1813277, at *8. Similarly, in Kuriakose, the court held that plaintiffs failed to adequately allege loss causation for their claims based on alleged misstatements by Freddie Mac regarding defects in its internal controls and underwriting processes where plaintiffs alleged that these defects came to light when the federal government placed Freddie Mac into a conservatorship. See 2011 WL 1158028, at *14 ("Plaintiffs make no specific factual allegations about the disclosure

-49-

of concealed information relating to Freddie Mac's internal controls and do not explain how they" would have been spared loss absent the "alleged failure to properly disclose weaknesses in its internal controls.").

But both Solow and Kuriakose exhibit fundamental gaps in the chain of causation not present here. In Solow, the court found that loss causation could not be demonstrated for some of plaintiff's allegations because the complaint in that case noted intervening causes, or because plaintiff simply identified "events and dates . . . relat[ing] to other negative information about the company" instead of highlighting those that related to his claims. See 2012 WL 1813277, at *8-9.[9] And the court in Kuriakose held that plaintiff's claims failed because the alleged disclosures that revealed the risks either uncovered no "new information about the failings of Freddie Mac's internal controls or underwriting standards," or, in the case of the decision to place Freddie Mac into conservatorship, offered no commentary on the subject at all. See 2011 WL 1158028, at *13-14.

---

[9] Plaintiff's claim in Solow that Citigroup's receipt of bailout funds and loss of foreign deposits represented the materialization of concealed risks regarding capitalization and liquidity failed for a more idiosyncratic, and basic, reason: the government's TARP Report attributed these events to a "lack of confidence" and not the risks identified by plaintiff. See 2012 WL 1813277, at *9.

By contrast, in this case, Defendants do not argue that an intervening event broke the chain of causation, and the November 21, 2011 Press Release specifically referenced a spike in commissions, rising labor costs, and increasing pressure on CNinsure's business model - exactly the subject matter of the OLP reports. Defendants' attempts to find parallels with Solow and Kuriakose fail because their arguments are premised on a too-narrow reading of the November 21, 2011 Press Release. See In re Vivendi Univ., S.A. Sec. Litig., 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009) ("For an event to qualify as a materialization of the risk, it need only disclose part of the truth that was previously concealed by the fraud.").[10]

---

[10] Defendants' derivative argument that the OLP reports do not establish loss causation because the November 21, 2011 Press Release does not relate to their predictions and findings fails for the same reasons. Likewise, Defendants' argument that the OLP reports do not establish loss causation because they rely on supporting documentation that was "publicly available" over the internet, although inventive, does not change the result. Even if the fact of internet availability of the supporting documentation is a distinguishing characteristic from earlier cases - and there is no indication that these documents were "available" simply by being dropped into the middle of the internet vortex in a way that functionally and materially distinguishes them from the Chinese-language newspaper articles at issue in In re Fuwei Films Securities Litigation, 634 F. Supp. 2d 419 (S.D.N.Y. 2009) - Defendants' argument proves too much. The logical end point is that the share price of CNinsure would have already reflected this information - but CNinsure repeatedly explicitly disputed these documents by denying authorship of the presentation and denying the existence of an equity incentive compensation plan in its entirety. That larger context overshadows any quibble over "public availability." This conclusion is further underscored by Defendants' own arguments that they have not advanced a "truth on the market" defense in this case. (See Dkt. No. 19 at 6 n.6.)

## IV. <u>ORDER</u>

For the reasons stated above, it is hereby

**ORDERED** that the motion (Dkt. No. 13) of defendant CNinsure Inc. to dismiss the amended complaint of lead plaintiffs Jeff Schram and Linda Schram is **DENIED**.

The parties are directed to confer and prepare a proposed case management plan for review by the Court at the initial conference on this case, which is here scheduled for Friday, July 26, 2013 at 2:00 p.m.

**SO ORDERED.**

Dated:    New York, New York
          24 June 2013

                                    _____
                                    VICTOR MARRERO
                                    U.S.D.J.